This time, we'll hear Pidot v. the State Board of Election. Good morning. Morning, Your Honor. Jason Turchinsky for Appellant Senator Jack Martins. We're here before this court because the issue of whether the trial court justified- it was justified in an order holding that there should be a special primary election for the Republican Party to be held for the 3rd Congressional District on Thursday, October 6th. We shouldn't be here for three jurisdictional reasons and for several substantive reasons. The trial court's decision should be vacated and case directed to be dismissed. First, Your Honor, with respect to Rooker-Feldman, we believe that this court's prior decision in Hoblock controls the analysis here and all of the factors in Rooker-Feldman are met. The plaintiffs here lost in state court. They were denied their remedy of their special election and it was affirmed on appeal and we believe that the interests of the other voters that they named align perfectly with the interests of Mr. Pidot below. They are- Mr. Pidot alleges that they don't complain of injuries caused by the state court judgment, but that's not actually true and they didn't really challenge this before the trial court. The State Board of Elections in New York has no power to schedule a new election. Only a court can do that. So when they went to the district court in this case, asking- I just want to ask a very simple question about the application of Rooker-Feldman and I am likely just missing something. But I thought Mr. Pidot essentially won in his petition validation proceeding. So that what we're really talking about is what remedy should flow from that. His petitions have been validated. So now he wants to have the election rescheduled, but the petition proceeding he prevailed in. So is- so would Rooker-Feldman be implicated in that circumstance? Well, Your Honor, I actually don't think he didn't prevail completely below. He prevailed on the question of whether he had enough signatures, but that determination wasn't made until June 23rd for a June 28th primary. And on June 23rd, the day before the judgment was issued on the 24th was the first time Mr. Pidot's- Mr. Pidot or his counsel made a verbal request for the scheduling of a special election. And in response when this- when the issue of the impossibility was raised, that was when the district court or the trial- the state trial court said we don't have we don't have the power- we don't have the time to do this for the June 28th date and we're not going to schedule a new date. And then- and it wasn't until well after that that on July 5th, the first federal complaint was filed in the Eastern District of New York and then withdrawn- sorry, June 27th, the day before the primary, the first federal case was filed in the Eastern District of New York, then withdrawn on July 5th and the instant complaint that we are appealing from the judgment from was filed July 13th in the Northern District of New York. Again, after the election was held. Or after the election day. So it's our contention that what they were actually doing was they were actually appealing the denial of the remedy. And that in our view constitutes complaining of an injury imposed by the district court. It was not the state board that's- that made a determination that they couldn't hold a new election. The state board did essentially agree with the contentions below that it was and there's plenty of information in the record as to practically why that's possible. And I also point this court to the Gold case from 1996 that this court decided where a state judge had ordered somebody removed from the ballot the day before an election and caused absolute and complete utter chaos in the conduct of that election. So this court has some experience with quickly ordered- quick elections held subject to judicial order. You know, the plaintiffs invited the district court to essentially review and reject that state court judgment. And there's actually no argument that the state court judgment, the June 24th order, was rendered before the district court proceedings commence. Switching next to the claim preclusion or race judicata procedural issue. This applies when there are- when the parties below were in privity with parties to the state court litigation. There's almost no doubt about that here, even though the district court found otherwise. Don't voters have an interest in this? I mean, the elections are not only about the candidates. That's true, your honor. And there's actually a divergence a little bit in this court's opinions. There's one line of cases that suggests that voters and candidates have a different interest in challenging essentially election laws. And then there's a line of cases that says specifically in ballot access cases, the interests of the voters and the interests of the candidates align perfectly. And I would point this court- and actually that line of cases is actually a little bit later. If you look at this court's decision- What if you had a voter who was undecided how to vote, but wanted to have a choice? Well, your honor- That could be this case. That could be this case. But in Rivera- I would point this court to its decision in Rivera-Powell, specifically footnote 11, where the court said that the Supreme Court and this court have treated the interests of voters and candidates as identical, particularly when First Amendment claims are raised in ballot access cases. That was a due process case, which is kind of off there in a corner, and I'm not sure that wasn't waived. Well, your honor, I think our view is Rivera-Powell was both a due process and a First Amendment claim, and this court addressed the fact that, you know, in a lot of the appeals- essentially appeals from state court determinations and ballot access matters, there's essentially a merger between the First Amendment and due process claims. That's what Rivera-Powell stands for, and that gets to one of the substantive reasons why this court should abstain. This court in Rivera-Powell said that federal courts shouldn't interfere in garden-variety state law disputes. New York law contains the appropriate process for reviewing this. And also, your honor, we point out the fact that Mr. Perdue stopped. He never went to the New York Court of Appeals. He stopped when he got the appellate division thing and then ran the same day to the state- to the federal court on the order to show cause that resulted in- the order that resulted in this hearing. And I want to specifically, since I don't have a lot- a lot of time left and there's a lot of issues, I want to draw this court to the underlying merits. The underlying claim that was- that apparently caught the district court's interest was the notion that the state had some obligation to seek a Move Act waiver and somehow that caused the impossibility. And I would point this court to the language of 52 U.S.C. 220302 sub g, where it talks about the waiver. The whole underlying premise of the waiver application and even the forms that the government promulgated- the federal government promulgated to apply for the waiver contemplate an election being set when you tell this court how- when you tell the federal government how you're going to comply with the Move Act requirements and how you're going to accommodate the needs of military voters. Without an election date being set, it was impossible for the state board to apply for such a waiver. And if this court is going to accept that proceeding, that access contest of any sort at the state or local level, a Move Act waiver is required. And- and I submit since the Move Act has been passed, that is not how Move Act waivers have ever been processed. Your argument that he- the- the chief state election official, the- the first moment at which he might have been concerned or she might have been concerned that a hardship exemption would be needed is certainly not before the petition- the petitions are validated four days after the election. Or has it been later than that? That- right. It would have been later because, remember, immediately the day after- The day, the same day. The- the same day or the day after the petitions were validated was the same day that the trial court said, no, we're not ordering a new election. So maybe I- I didn't state your position as strongly as you're stating it. There was never a moment where the state election official was facing a prospect where he's- he or she should know the state is unable to- to meet the requirements of this federal. That's- that is correct, Your Honor. That's- that's our view and that's where we think the- that's where we think the district court erred on one of the substantive issues that was in front of it. And- and without, you know, if this court is going to adopt the district court's conclusion on that, it would- it would contradict what the Eleventh Circuit said in the United- in United States versus Alabama, where on page 930 of that decision, the Eleventh Circuit said essentially applying for a hardship waiver requires a new election date. Until there's a new election date, you can't apply for a hardship waiver. So the notion that there was some obligation here on the part of the state board just because there was litigation over ballot access to go apply for the waiver is- is a little bit hard to comprehend. And on top of that, even if they had applied for a waiver after the appellate court had reversed in the beginning of June, it's not clear that this- the state trial court was going to order a new election or order in an election to be held on June 28th. So so the state board was in a- was in a tough spot, but we don't believe that there was ever any obligation under federal law to apply for a waiver. And even if they had applied for a waiver, it still wouldn't have prevented the impossibility problem that caused the state trial court on June 24th to reject the request for a special primary or to reject the request for- to add Mr. Padot's name to a June 28th ballot. Because also keep in mind, on the June 28th ballot, there was no statewide election or statewide primary for U.S. Senate from either party. So it was uncontested. And so the only election that would have been held in Eastern Queens- sorry, yeah, Eastern Queens, the southern half of Nassau County, and the southwestern half of Suffolk County would have been this election, which would have meant programming the voting machines, distributing the voting machines, testing the voting machines, printing the ballots, finding the election workers. I mean, all of the things that go into the different burdens that this- that the state and the election would have had to happen in five days. Just to get clear in my mind, on the 28th of June, yes, what- what election took place? And did your client's name appear on the ballot? That was the federal election day set by Judge Sharp as a result of the federal litigation over the MOVE Act. And under state law, if there is no- if there is only one person who's qualified to run for that office, no ballot is printed, but that is still the election day for both state law purposes and for campaign finance purposes when, in this case, Senator Martins became the Republican nominee for the general. So the June 28th day, even though there was no- there was no ballot printed, that was the primary election day that- that cemented Senator Martins as the Republican nominee for the third congressional district, until the federal district court almost two months later undid that. And with that, I- You've reserved three minutes of rebuttal. Yes, Your Honor. Thank you. Good morning. May it please the court. Jerry Goldfeder, on behalf of Philip Doe, Nancy Hawkins, and Mr. Axelman, the voters. The question that you just raised underscores the central fact here, which is not a vote was cast by any of the 152,879 Republicans of the third congressional district. And Mr. Martins is claiming that his nomination by operation of law by default is a protected interest. Voters went to the polls on that day. Voters did not go to the polls on that day. There was- there was no- there was nothing on the ballot. There was nothing on the ballot. There were no voters going to the polls by operation of law. That's what he's claiming as his protected interest. That's why we're saying he has no standing. The- the district court did not order him as an intervener, didn't order Mr. Martins to do anything or to refrain from anything. He's here appealing based upon a so-called protected interest, which he doesn't have. He doesn't have a protected interest to be the nominee in an election where nobody votes. And so, I- if- if the injunction stands, surely he has a protected interest in having to engage in a- in a primary election- The question is whether- a month before the general election. He has a general interest. That's correct. He's already on the general ballot- the general election ballot on other lines. Of course, he has some- colloquially speaking, he has an interest. But as a question of standing, he does not because he doesn't have a protected interest under the law. We have- we have a- another procedural issue that I wanted to address preliminarily, and that is the Board of Elections, the City Board of Elections, the State Board of Elections, have not appealed or cross-appealed. And yet, they are here today seeking to overturn the judgment of the District Court. The Court's- the Court's decisions are very clear that that cannot be done. And so, we have Mr. Martins arguing what he did not argue in the District Court. That is that  Board of Elections- the State Board of Elections, by not seeking a waiver, caused a constitutional infringement by not having a primary. Mr. Mayor, Mr. Martins has no business being here. The New York State Board of Elections has- has no business being here. The Board of Elections, the City of New York, has no business here. And I'm willing to bet that you don't think Mr. Suozzi has any role being here, correct? Well, he's here as an appellee. Oh, he is an appellee. He's an appellee. He's a legitimate appellee. So, what do we have? We have a District Court judgment that after a full opportunity by everyone who's sitting at these tables to present evidence, to make their arguments, Mr. Martins didn't make the argument that the Board of Elections didn't violate the law. And by the way, the statute requires that they seek a waiver if there is a legal contest. If we were to accept his analysis that the only time a waiver can be requested is at the end of the day when it's determined the validity or the invalidity of a candidacy, that eviscerates what Congress contemplated. Is it your position that the filing of a complaint that's unadjudicated triggers... Not unadjudicated, no. Here we have had a situation where my candidate, who's been declared eligible by the State Courts... It's not merely a filing of a lawsuit. It's a filing of a lawsuit that gets resolved. It's a filing of a lawsuit that is being adjudicated where there is a legal contest, where the Board should have made a determination that there's a chance that this candidate is going to be on the ballot. And therefore, because there's a legal contest where they make that determination, we better seek a waiver. Well, you know, the service of a summons and complaint or the filing of a complaint triggers a contest. How would anybody possibly know at what point after that they were required to seek a waiver if there had not been some sort of resolution in court where the... Well, let's look at it the other way. If we're going to wait for a resolution, then there'll never be enough time to seek a waiver. And that defeats the purpose of the exemption that's required in the law that Congress wrote. Boards of... These kinds of contests... I'm sorry. Can I just intervene? Because I think this point is connected. I'm having difficulty since we talked about why everyone else shouldn't be here. But your client... Is it really the case that your client suffered an injury that's fairly traceable to the conduct of the election officials and not seeking a waiver? Because as I read the record, four days before this special primary is to take place, he finally prevails on his petition, yes. But the state courts say it's impossible to get the ballot prepared for a June 28th primary. And so, Mr. Pitt... And that has nothing to do with whether you seek a hardship waiver or not. That's just about whether you can prepare the ballot. Well, no. It's in part because of the waiver. It's in part because of the waiver, and the district court found that. One could also say that it's in part because of the local boards of elections didn't prepare. Mr. Peddow, when he submitted his petitions, they were presumptively valid. As a result of Mr. Martin's objections and litigation, he had to go through this whole process, and he was finally declared an eligible candidate. So here we have an eligible candidate who's not able to compete on a primary ballot. He seeks a remedy in state court as a result of that, saying that, pursuant to state law, there's that kind of irregularity that has existed, and therefore the court should order a primary. State court says they don't have authority for that. It would seem that the state procedures for contested primaries, coupled with the state court procedures for resolving issues, is arguably completely inadequate to the needs of the voters and the needs of the people who wish to abide for their support. But the federal courts are supposed to avoid embroilment in the state election mechanisms. We didn't ask it in the district court, and we're not asking this court in any way to embroil itself to be involved in state procedures. That's not what's being done here. This is not about the state judgment. And you're not defending Judge Scullin's injunction? Yes, but that injunction is as a result of voters who are separate and apart from Mr. Pidot, who's also a voter, in addition to his being a candidate, voters being deprived of their First Amendment rights to be able to vote in a contested primary. That's why they are not state court losers. That's why Rooker-Feldman doesn't apply. That's why there's no preclusion defense that's valid, because the record is barren as to their identicality with Mr. Pidot. It's separate and apart, their interests as voters going to a federal court that can, because the state court felt it could not, under state law, but under federal law, the federal court can and did, in this circumstance, say, you voters, you had a constitutional right to associate by voting. That was prevented as a result of the boards of elections, including the state boards, not preparing properly for that June 28th primary. And the state board not asking for a waiver. And that is, and that was the... The order is telling. Isn't the primary cause, the cause of not being able to hold that June 28th primary is that your client's validating petition exercise did not conclude until days before that primary. That's separate and apart. I'm just seeing, having a disconnect. How your client's injury, or even the voter's injury, derives from the failure to seek a hardship exemption. I'm not going to say that it's as a result of the crazy timeline of the state election law that caused this problem. But obviously it did have a role here. What the court below found, that we have a problem here where voters could not vote for either of the two eligible candidates. And it was caused as a result of the boards in action. The district court happened to pick out the state boards in action. This court can search the record and make a determination that's broader than that, if you wish. You can follow what this court did procedurally in New York Progress and Protection Political Action Committee. You can search the record and expand the finding and make a determination that yes, we know that the voters' rights were infringed upon. They weren't able to vote for either one of these eligible candidates. And there are a variety of reasons for that, that caused that. And we determined that the state board should have asked for a waiver, the local board should have prepared. There was a hotly contested litigation during which the Supreme Court, the appellate divisions were involved. But the end result wasn't Mr. Perdot or the voters' fault. And yet, should their rights to be able to vote for either one of these eligible candidates be infringed upon without any remedy because we can't identify precisely what caused it? We know what caused it. We know that it was caused by multiple reasons. Judge Scullin picked out the state boards in action, and I think correctly. You have the authority under the Political Action Committee case that I just cited to search the record and look into that a little more carefully. Because if you reverse, because the cause was not identified precisely to your satisfaction, then the voters, through no fault of their own, have not had an opportunity to vote either way. And by the way, this election is scheduled for three weeks from tomorrow. The candidates have been campaigning. The voters know about this election. If you were to reverse and prevent this election from going forward because there's some imprecision as to how this occurred, we know that Mr. Perdot didn't cause it. We know the voters didn't cause it. If this election does go forward and you would concede that unless this office is voted on separately in December after the voters, who may be quite tired of the whole political process, think it's over, then the period of campaigning as between the Democratic nominee and the Republican nominee would be limited to about a month. Mr. Martins is already on the general election ballot as the Reform candidate, as the Independence Party candidate, as the Conservative Party candidate. He's been campaigning. His argument that... No, but he probably would like the voters to turn out. They would like... They're going to turn out on November 8th because there's a presidential election. There's going to be very high turnout on November 8th. And that's going to include... Does this limit the time that the voters have to choose between two candidates? This is not... They've been campaigning. This is parliamentary elections. Mr. Martins has been campaigning. The record is clear that Mr. Martins has been campaigning. He thinks he's the Republican candidate, number one. Number two, he's the Conservative, Independence Party, and Reform Party candidate. He has been campaigning throughout against Mr. Swasey. Mr. Swasey has been campaigning. They've both been campaigning for the general election. If this court wants to move the general election ballot, we're opposed to that, but if you need to do that in order to make certain that the voters have an opportunity for a primary, then, as far as I'm concerned, that's fine. Your argument that Mr. Martins and Mr. Swasey have been campaigning all along and, therefore, the voters have more than enough information to vote on assumes that your client doesn't win the primary. Suppose your client does. That's a very good point. Then the Republican nominee, who would be your client, would have one month to campaign against somebody who's been beating the drum for months already. Thank you for raising that. Mr. Peddow recognizes that, and that's not a problem for Mr. Peddow. It may not be a problem for Mr. Peddow, but it may be a problem for Republican voters. That's not the problem for my clients, who include Republican voters. They know that this is going on. There are articles all the time in Newsday, which cover this area about the contest between Mr. Peddow and Mr. Martins in these courts and so on. And that is the lesser of two evils, if you will, as opposed to not having any primary whatsoever. It's not a solution to this situation we find ourselves in, to conclude, well, only 30 days between the primary and the general election, if it's 30 days or whatever it is, versus no vote at all in a primary. I don't think that that would be— You would agree that the calling of a special election is an extraordinary remedy for a court to engage in. In this circuit, I think we've only engaged in it in the voting rights context. And one of the equitable interests that's cited is voter confusion about changing election dates. Correct? Yes. At this point, the voter confusion would be to take away the right. They now know because this was determined a month ago. They didn't ask for a stay of an enforcement. Did the district court adequately consider that equitable consideration in making its initial decision? Absolutely. That was argued before the court. It was fully briefed before the court. The judge—we had asked for September 13th, as a matter of fact. That was our suggestion because the state legislative races were going on on September 13th, which turns out to be yesterday. The judge made a determination that it would be October 6th because he wanted to make sure there was a 45-day period between his determination and the new primary, so there wouldn't be a waiver situation for the primary. So he was fully aware of that issue when he made his determination. And so, at this point, Mr. Morton's not having sought a stay from August 17th to today, having waited to appeal, if there's any confusion a month after the voters and the media and the candidates think that there's a primary, it's not a confusion that ought to lead to the conclusion, we better stop the primary. On the contrary, this becomes the status quo as a result of a district court decision from a month ago, and I think it's the correct one. It's the correct one because in this extraordinary case, we have an eligible candidate who doesn't have a right to compete. His rights as a candidate, the voters' rights to be able to vote for somebody who's eligible, has taken away. And if this court reverses- If I'm misunderstanding the record in some way, but the appellate division said in its decision on the petition, validating the petition but upholding the denial of the remedy your client was seeking, in part because your client had failed to raise it, the appellate division said, until the last moment, until the few days before the election was to be held. That's actually right. My predecessor counsel, at the time, the motion to dismiss the case as a result of impossibility was made a week before June 28th primary. In other words, here we are at a trial on the merits. I wasn't there, but I've read the transcript several times, as you can imagine. Here we are having a trial on the merits. Does he have enough signatures or does he not? That was the only issue before the court. And Mr. Martin's objectors, its counsel, made a motion to dismiss at that point, in the eleventh hour, saying, well, even if he has enough signatures, it's impossible because of the state board, and it's impossible because of the local board. Both reasons. And the state board was on, was part of the discussion by telephone, and they said, we have a problem because of the waiver, and so it's also impossible. They said it then. He made the motion at the eleventh hour, and the court, the Supreme Court, said, well, the only thing that's before me and the only authority I have is whether or not he's eligible or not, whether he has enough signatures or not. So, at that point, the counsel really had no idea what to do, to tell you the truth. And he- Did your client contact the Board of Elections in any way, as the legal contest is going, to say, I'm still in the midst of this legal contest, but I think I'm going to prevail, and there's going to be, the time is ticking? They were, no, as far as I know, he did not. But is it incumbent upon him to do that? Do we blame Mr. Padot, and do we blame the voters? If nobody had the sense to think that impossibility might be an issue when it was raised at the eleventh hour, it's not as if this was an issue from the beginning of the case. So, absolutely, it was raised, this, what counsel said was, well, maybe we need a new primary, and I don't know, he said in the transcript before the Supreme Court, he said, I don't know if it's state Supreme Court or federal court, because this was a new concept. This doesn't happen every day. It rarely happens that there's not enough time for, to put people on the ballot. And so, the remedy sought right then and there was, of course, denied. And the appellate division said, well, you didn't properly ask for it. The Halley, I'm going to try to pronounce it correctly. The Halley-Yalkar case, which we cite to, states, it's the New York Court of Appeals, states that if you don't properly ask for it, which was the case here, it's as if it wasn't done. That goes to Ruckelsfeldman, that goes to preclusion, that goes to those issues as well. But he couldn't have asked for it in advance, because the motion to dismiss on account of impossibility was only done at the 11th hour while they were discussing the merits. So, the long and short of it is, this really is a conundrum that you face. I appreciate that. It's the same conundrum that the district court faced. And the question is, is there a wrong here without a remedy? I certainly hope not. The district court, in its way, analyzed the causes for this problem, analyzed how this infringement of the First Amendment rights of the voters came about, and made a determination. As I say, I believe that you ought to affirm and let the voters continue to not only believe that they have a primary three weeks from tomorrow, but allow them to do it. Because if you reverse, because of the imprecision, or you disagree with the analysis of how the judge got to his conclusion, then who suffers here but the voters who are entitled to be able to vote for one of the two eligible candidates. So thank you very much. This time we'll hear from the State Board of Elections. Thank you, Your Honors. May it please the Court, Brian Quayle for the New York State Board of Elections. The New York State Board of Elections, in the context of the proceedings in the district court below, strenuously opposed the moving of the general election date from the date set by Congress for Tuesday, November 8th, to a date in December, December 6th, in order to accommodate the primary on October 6th. And the reasons stated for that were pretty clear. The injuries that the United States Supreme Court noted in Foster v. Love would be manifestly evident if the date of the general election were to be moved. The potential stakes for the congressional election in the Third Congressional District of New York would be magnified and greater, potentially, than any of the other congressional races taking place anywhere in the nation, potentially, depending on the majorities in Congress that might result in that election. There's a potential, any time elections are offset from one another for a single elective body, that you'll have a distortion impact. But surely each group of voters in each separate district would be voting only once. Absolutely, Your Honor, but the potential stakes of the outcome of the election would be greater. Even the Third Congressional District could be obsessed with what people are doing in the Fourth Congressional District or in the First Congressional District in Pennsylvania. Oftentimes, Your Honor, it has something to do with the overall stakes of the election in terms of the ultimate impact on the governing body itself. So it's not, when the voters go to the polls, they're looking at the choice between two people, but they're also looking at the stakes of that choice. And when elections are offset for the same representative body, for no good reason, you potentially have that kind of distortion. But more fundamentally than that distortion is the distortion in the electorate itself that would occur if the elections are offset from one another. We have an election in November where in this Congressional District, based on the results in 2012, and this is certainly in the record, there was 70% turnout. We will see a turnout in a special election for Congress, and again, this is in the record, that would range typically between 11 and the mid-30s percent. So the electorate would be dramatically smaller if the date of the election were moved. Your Honor pointed out that there would be potentially an issue with the voters only having a shorter period of time to make a determination in the race. The reality is that as an election contest gets closer, the attention of the voters becomes more focused. And certainly in this case, Your Honor, because- When can people send in mail ballots? Well, specifically for the November election in the 3rd Congressional District, because the-I'm going to start, Your Honor, with voters who are covered by the MOVE Act. Normally, boards of elections would have transmitted by 45 days before, which is September 24th. Because of the remedial primary that was actually ordered by the court within that 45-day window, the court made as part of its order that the board of elections should do something to ensure that that reduction in time is mitigated. And so we, as required, applied to the Department of Defense, on notice to the Department of Justice for a MOVE Act waiver, and implemented various mechanisms to ensure that we would indeed mitigate that time. Generally speaking, with absentee ballots, they're mailed out about 32 days before the election. So with an election that is occurring on October 7th, there is potentially going to be a slight delay in the mailing of absentee ballots. And mitigating for that would be something that election officials would also need to do. One of my questions, if I can make it clear, is will there be people-how much time will people have to vote in the November election if they have to file mail-in ballots? As soon as the results of the primary are known, then the board of elections will- the three boards of elections that are involved here that actually issue the ballots will issue ballots and get them out as quickly as they possibly can. And as it comes to pass- The November election? Yes. Yes. And if there are protracted legal contests, for example, as a result of a state primary that would occur in September, it can sometimes occur that there are delays because of those contests. So it's not ideal, but it is something that does happen sometimes. And still leaving enough time for people to get those ballots and get them returned. Because there are some states in which people can start voting next week. Yes, there are some jurisdictions that have early voting, and there are different time frames. And in a jurisdiction where ballots are done, they'll get them out sooner. That is not an issue or problem in this case. I apologize, I don't think I- That is not an issue or problem in this case, the special case of individuals who vote by mail. It is an issue, Your Honor. I agree with your assessment that there is a delay in the absentee ballots. But that particular issue is because there needs to be, if there is one, a remedial primary. Which leads me to my last point, if I may have just one moment, Your Honor. Go ahead. Which is that in so much as the State Board of Elections strenuously opposed the movement of the general election, we also indicated in our filings with the court that we agree that under Rooker-Feldman that the court should not have exercised jurisdiction. And finally, that with respect to the Move Act- But if there was no primary at all, so if there is one now, that is not going to be a burden, financial, unexpected, unanticipated, incremental financial burden. If there were no primary, the Boards of Elections, and you will hear from the biggest, well, one of the biggest, the biggest in the state, but one of the Boards of Elections in this Congressional District about those kinds of issues, I imagine. But the Board of Elections believes that it did not create injury on the part of Mr. Padot by not applying for a Move Act waiver because assuming arguendo that we should have- Are you able to apply for a Move Act waiver without knowing the date of the election? Meaningfully, no, because you have to provide a comprehensive plan for how you are going to mitigate it. You're saying a lawyer couldn't figure out how to set a range? You could potentially have a generic waiver, Your Honor, that would say if something happens between this date and that date, we'll do this, and if this, then that. But the- People do. People do do that, but a meaningful waiver has to take into account the particular Boards of Elections and the particular issues that are faced. They're not all precisely the same. But assuming arguendo that the Board should have done that, Your Honor, there's no injury traceable to Mr. Padot because had we applied for that waiver that assumed this and assumed that, it would not have changed the fact, had we applied for that, that a primary would have been possible. And if a new primary had been ordered by the court, then that primary could have been scheduled in a Move Act compliant manner, which would have obviated the need to have applied for a waiver. Okay, thank you. We'll hear from the city. Good afternoon. Good afternoon. May it please the Court, Janet Zalian for the Board of Elections in the City of New York. As we explained in our brief, this holding an additional election and possibly two, primary and a general election, would constitute in this presidential election year a very heavy administrative burden on the Board, the heaviest burden that can be because of having had the September 13th primary and having, of course, the heaviest type of turnout in a general election. There was no September primary. No, but in terms of – It was a congressional. Right, but in terms of our workload, certifying the results of those state and local primaries while preparing for an October primary, we have taken certain steps, such as mailing out the absentee and military ballots because the district court had ordered the election. But the fact remains that not only must additional tasks be undertaken, as described in our brief, but in addition, to prepare for a December general election for this particular congressional district alone would cause diversion of resources from the task of certifying the results of the general election in November, including the tasks related to the presidential election and the certification of the results so that the presidential electors can meet for New York. Oh, well, this would be doable if this was an off-year election. It's much more doable. There are special elections that are held different times of the year. I was going to get to that because special elections are not – they may be special, but they're not unheard of. They're not unheard of, but they're often either, as you mentioned, in an off-year election it would be less burdensome, but often there are different times of the year when that is the only election taking place. It might be in April for some reason somebody resigns from a seat and there's a special election. Does the court have any other questions for the city? Thank you, Your Honor. Thank you. We'll rest here. Thank you, Your Honor. May it please the Court, Aba Kana for Intervenor Appellee Tom Suozzi. Our argument here is very narrowly limited to the appellant's alternative – Object. Yes, the alternative request to move the general election. Regardless of how the court rules on the issue of the October primary, we believe that the court should deny appellant's request to move the general election from November to December for at least three reasons. First, the original basis of appellant's request to move the general election, that failure to do so would somehow violate the UOCAVA, has fallen away. UOCAVA, as amended by the MOVE Act, expressly authorizes applications to – of overseas voters are protected without altering or upending election schedules here at home. The state has applied for such a waiver here. The Department of Defense has authorized that waiver in detailed memorandum, specifically finding that overseas voters, pursuant to the state's comprehensive plan, will have sufficient time to have their votes counted in the November election. There simply is no UOCAVA issue that warrants this extraordinary relief that the appellant seeks. Second, and as touched upon by counsel for the City Board of Elections, in arguing against the imposition of an October primary, appellant devotes a fair number of pages in his brief to the very real burdens that come with a special election, including the high cost, including the likelihood of voter confusion, including the likelihood of low voter turnout. But appellant, in his request for alternative relief, he fails to recognize that those same burdens would accrue with a postponed general election, which is essentially a new general election, a month after all the other elections take place. And we would contend that it makes very little sense that appellant's proposed cure for the imposition of an October special election is to essentially double down on those burdens by creating even more cost and more burden on the city and on the state. And third, the only other countervailing interest that appellant has identified to justify the extraordinary relief he seeks of moving the general election is fairness, and specifically he contends that it's not fair, it would be unfair to have one candidate's, one party's nominee, have more time to run a campaign for the general election. But that justification falls flat for a couple of reasons. You're representing Mr. Schwozle at all this time. Mr. Schwozle has been the Democratic nominee since the June 28th primary. We may not know who his adversary is, that's no small thing, but his opportunity to campaign would not be curtailed no matter what happened. That's certainly true, but Mr. Martin actually has been the undisputed nominee for two other parties, the Conservative Party and the Reform Party, since well before my client was the candidate, was the nominee of the Democratic Party. So he's had technically since May 4th to campaign for the general election, whereas my client has had two months less than that. And the thing is that that does happen. As a matter of course, time and time again in state and local elections, party nominees are decided at different times for any number of reasons, whether there's a runoff or whether there's a contested primary or whether there's a withdrawal. And the general election deadline does not, the clock does not just restart every time that that happens. And more importantly, there really is just no authority for moving the general election on this notion of equal time. The only case cited by appellants is Busby v. Smith. And in his reply brief, appellant notes that he cites it for the limited proposition that maintaining the November election date provides insufficient time for voters to make a reasoned selection among candidates. But that misses the entire point of Busby, the Busby case, the catalyst behind every decision in the Busby case, whether it was the court's decision to invalidate the original redistricting plan, the attorney general's decision to object to the election schedule, or the court's decision to move the election, the basis for all of that was the protection of minority voting rights pursuant to federal law, pursuant to the Voting Rights Act. That very critical element is dissected from appellant analysis, or discussion of that case, to suggest that Busby stands for some kind of general proposition that candidates must be afforded equal time on the campaign trail. That is not the reasoning of Busby. No other case has ever suggested, let alone held, as much. And that's certainly just not the practical reality in elections across the country where candidates get nominated, or nominees get determined at different times. Unless the court has any further questions? Thank you very much. Thank you. I think we have rebuttal. A couple of points. One, I want to draw the court's attention to what this court said in the New York Progressive Protection Pact, what the Supreme Court said in Winter, and what the Supreme Court said in Purcell. With respect to injunction factors, the district court here made a complete mess of the procedures. This case was brought on an order, the decision resulting on August 17th was a result of a preliminary injunction motion that was brought on an order to show cause. And then it appears that the final judgment, when the judge took his 12-minute recess, came back on, and gave his oral decision, he appeared to do it in the form of a final judgment. He never analyzed the injunction factors. He never looked at issues like, I mean, I guess likelihood of success, he has one line where he finds that the MOVE Act waiver was required. He didn't do, he didn't, he did no analysis at all of irreparable harm. He did no analysis at all of the balance of equities, and he did no analysis at all of the public interest. He, the motions that he had before him from the other defendants. What is their standard of review? On the questions of law, Your Honor, we believe they're de novo, and otherwise abuse of discretion. The motions that were pending before him were motions to dismiss, and in fact, Mr. Senator Martin's petition to dismiss was, or motion to dismiss was denied as MOVE, which we still don't really understand what he meant. And there was no motion for summary judgment. He just jumped directly to a final conclusion with no analysis of injunction factors in order for the court to close the case. Part of the reason that the state court wound up in the difficult position that it was the week of June 20th was because Mr. Padot delayed 30 days between the initial dismissal of his state court action in the beginning of May until he brought the case to the state court's appellate division in the beginning of June. There was a 30-day delay. I mean, he had a motion for reconsideration pending with the state trial judge, but he didn't go to the appeals court at the same time or go to the appeals court at all until 30 days had elapsed. Had Mr. Padot not allowed those 30 days to elapse back in June, we may have been in a very different position. With respect to your question about whether the interests of the voters here differ, I'd point the court to dockets 56 and 57 below where Hawkins and Axelman indicate that they were going to vote for Padot. It's not like these were supporters of Senator Martin's who said, oh, yeah, there should be a contested primary. That's not what happened here. They retained the right to vote for whomever. That's true, but they told the court they were going to vote for Padot. Padot made no argument here really that the voters have any kind of different interest here, and I point the court to the language in Hoblock and the language in Ferris and let the court determine whether these voters were actually essentially pawns of Mr. Padot. I contrast the line of argument that says that voters have a different interest than the candidates here in voting rights cases or voting cases in general from the specific ballot access claims that this court noted in footnote 11 in Rivera-Powell. Also, I note for the court that there was no claim at all. In fact, they disclaimed any challenge to the constitutionality of any of the state election laws here. With respect to the standing question that Mr. Goldfeder raised, Martin's was ordered to compete in a new primary, and the district court's order was very specific that Mr. Martin's name was to appear on the ballot along with Mr. Padot's, and I point this court to, for example, the D.C. Circuit's opinion in the Crossroads GPS case where they allowed intervention. They basically said that when an agency benefit is removed, you have standing to intervene and to appeal, and even the Supreme Court's decision recently in the redistricting case in Whitman, they dismissed that case because none of the candidates, even had they proceeded to decide on the merits and won, none of the candidates were going to run in that election district. That's the exact opposite of what we had happen here. Mr. Martin's has made clear from the beginning he intends to run and be a candidate in New York's third congressional district. Fifth, with respect to the waiver issue, again, the waiver did not remove the impossibility that was presented to the state trial court in that third week of June, and, in fact, when Mr. Padot initially went to the trial court, if you look- It seems like we're starting again at the beginning. Yeah, I'm- This is reply. Sorry. Is there anything you want to slap down that's been- Yeah, a couple of things. The voting in November with an October 6th primary is, in fact, a real problem. With respect to military voters, they did get a MOVE Act waiver to send the ballots late, but the MOVE Act waiver doesn't waive the provision of New York law that requires that the ballots be marked and mailed on the day before Election Day. So these military voters, even assuming that these ballots are able to go out on October 7th, and there's no guarantee that they will be because we don't know whether the October 6th special election will be close, these voters still have to mark and mail their ballots by November 7th under New York state law, which was not- The federal government can't waive that provision of New York law. So let's hypothetically say it takes a week or ten days to resolve the October 6th election. The amount of time that military voters would have to vote and have their vote validly cast under New York state law is dramatically reduced, even in the presence of the MOVE Act waiver, because the MOVE Act waiver doesn't waive that provision of New York law. And I want to address the argument made by Councilman Suozzi about moving the general election. When you balance all of the factors, yes, we understand that special elections are costly for the boards and result in low turnout, but if candidates don't have sufficient time to get their message out, that's a balancing equity as well that requires it. And I also think in Mr. Martin's briefs, it's interesting to note that he, for the proposition that the district court had the power to set the special, Mr. Padot relies on Busbee, and yet when he argues against our argument that there should be a special in December, he also says, hey, Busbee doesn't give the court the power to do what we think the court has the power to do. Thank you. Thank you. Thank you all. It's been expertly argued. This is our disposition. The injunction is hereby vacated, and the district court is directed to dismiss the complaint, and order will follow promptly. The remaining case on calendar is SHIP versus Frontier Communications. It is taken on submission. That being the last case on calendar, please adjourn court. Court stands adjourned.